IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROBIN HOUSTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | FILE NO. 1:13-CV-00206-TWT |
| PUBLIX SUPER MARKETS, INC., | ) | |
| | ) | JUDGE: Thrash |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MOTION FOR LEAVE
## TO ADD PARTY DEFENDANTS AND BRIEF IN SUPPORT

COMES NOW Robin Houston, Plaintiff in the above-styled action, by and through her undersigned counsel of record, and pursuant to Federal Rule of Civil Procedure 15(a)(1)((B) and 28 U.S.C. § 1447(e), moves the Court for leave to amend her Complaint for Damages and add Tiffany Roy and Garrett Peterson as  Party Defendants, showing this Honorable Court the following:

## I.  STATEMENT OF FACTUAL AND PROCEDURAL BACKGROUND

This case is a personal injury action wherein Plaintiff Robin Houston was seriously injured as a result of slipping and falling in a foreign substance on the floor of the premises occupied and managed by Defendant Publix Super Markets, Inc.

1

(hereinafter referred to as "Defendant Publix") in McDonough, Georgia. (*Generally*, Docket No. 1- Complaint.)

Plaintiff alleges that she slipped in a foreign substance and fell violently to the floor, resulting in serious personal injuries (Docket No. 1- Complaint ¶¶ 10-11.)

The incident occurred on or about July 24, 2012 and the two-year statute of limitations that applies in this case has not expired. (*Compare*, Docket No. 1-Complaint ¶5, *with*, O.C.G.A. § 9-3-33.)

During the course of discovery, Plaintiff learned that Tiffany Roy was an Assistant Customer Service Manager  Moreover, Ms. Roy was on duty and serving as the Manager in Charge of the subject Publix grocery store when Plaintif slipped and fell. (Tiffany Roy Deposition, pp. 16 and 19.) (Excerpts from Ms. Roy's deposition testimony cited within this Motion and Brief in Support are attached hereto as Exhibit 1.)  As Manager in Charge for opening the store, Ms. Roy was responsible for making sure that the store was ready for opening, ensuring that the sales floor was clean, and that each department had associates in position and ready for customers. (*Id.* at p. 21.)

2

Ms. Roy's duties as the Manager in Charge included checking for and ensuring that the floors of the store were clean and free of foreign substances and hazards, including the dairy aisle where Plaintiff slipped and fell. (*Id.* at pp. 21-22 and 99-103; Deposition Exhibit 23.) Ms. Roy's duties also included making sure that all Publix associates were performing their duties and following Publix guidelines. (*Id.* at pp. 20-21.)

Ms. Roy is a Georgia resident. (*Id.* at 6).

During the course of discovery, Plaintiff further discovered that Garrett Peterson was a Front Service Clerk. Mr. Peterson was hired by Publix on June 16, 2012, thirty eight days prior to Plaintiff's slip and fall. (Garrett Peterson Deposition, p. 6.) (Excerpts from Mr. Peterson's deposition testimony cited within this Motion and Brief in Support are attached hereto as Exhibit 2.) As a Front Service Clerk, Mr. Peterson's duties included bagging groceries, cleaning, floor care, and cashiering. (*Id.* at p. 11).

Mr. Peterson received 11-12 hours of formal training over the course of two (2) days, which consisted primarily of watching short videos and taking written quizzes. (*Id.* at pp. 8-12.) The training covered company history, floor safety, fire safety, and theft prevention. The floor safety video was titled "Don't Pass It Up,

3

Pick It Up," was approximately 4 minutes long, and showed how to sweep, mop, and clean the floors. (*Id.* at pp. 11-13.) Mr. Peterson's on the job training consisted of "shadowing" another Front Service Clerk for approximately 30 hours. During this process, he was first shown how to perform a task, then performed the task himself, and afterwards would be asked if he had any questions. (Tiffany Roy Deposition, pp. 41-44.)

Mr. Peterson was on duty at the time Plaintiff slipped and fell, having reported to work at 7:31 a.m. (*Id.* at p. 5.) Upon arriving at work, Manager in Charge Tiffany Roy instructed Mr. Peterson to dust mop the floors for the entire store. (Garrett Peterson Deposition, pp.30-31; Tiffany Roy Deposition, p. 124) Ms. Roy never told Mr. Peterson that he could just sweep up the middle of the aisle or skip aisles. (Tiffany Roy Deposition, p. 124.)

The Publix Policy and Procedure Guide to Quality Floor Care requires employees to use a dust mop to slowly sweep each aisle on both sides. (Garrett Peterson Deposition, pp. 19-21; Tiffany Roy Deposition, p. 80 and 82-83).

Approximately four (4) minutes before Plaintiff slipped and fell in the dairy aisle, Mr. Peterson dust mopped down the middle of that aisle only. Mr. Peterson

did not dust mop the area of the aisle in which Plaintif slipped and fell. (Garrett

Peterson Deposition, pp. 22-25; Exhibits 17-19 [surveillance video frames])

It is a violation of Publix policy to only dust mop one side of an aisle and a

potential safety hazard. (Tiffany Roy Deposition, p. 83.)

Mr. Peterson is a Georgia resident. (*Id.* at 35-36).

For the foregoing reasons, Plaintiff *moves* this Court for an Order allowing

her to *amend* her Complaint to add Tiffany Roy and Garrett Peterson as Party

Defendants. A proposed Amended Complaint is attached hereto as Exhibit 3.

## II. ARGUMENT AND CITATION OF AUTHORITY

Plaintiff's Complaint for Damages sets forth a cause of action commonly

known as a "premises liability" claim. She seeks recovery against the owners and

occupiers of the subject Publix grocery store for failing to exercise ordinary care to

keep the premises safe from hazardous conditions. (*Compare*, Docket No. 1-

Complaint ¶¶ 5-10, *with*, O.C.G.A. §51-3-1 *and interpretive case law.*)

Defendant Publix removed Plaintiff's Complaint for Damages from the State

Court of Gwinnett County, Georgia to this Court on the basis of diversity. (Docket

No. 1- Defendant's Notice of Removal.) A Federal Court sitting in diversity shall

apply state law when considering state law claims and defenses. *See generally,*

5

Rhone v. State Auto Mutual Ins. Co, 858 F.2d 1507 (11th Cir. 1988); Auer v. Kawasaki Motors Corp., U.S.A., 830 F.2d 535 (4th Cir. 1987); *see also*, Singletary v. Southeaster Freight Lines, Inc. and Liberty Mutual Ins. Co, 833 F. Supp. 917 (N.D. Ga. 1993).

Pursuant to O.C.GA. 51-3-1, an owner or occupier of land is liable for injuries caused to an invitee by his or her failure to exercise ordinary care in keeping the premises safe. Georgia courts define an "owner or occupier" as a "person who maintains a place of business to sell goods or services." Rhodes v. K-Mart Corp., 240 Ga.App. 57, 58, 522 S.E.2d 563 (1999). Under Georgia law an "... owner or occupier" includes a person in chage of the premises. Coffer v. Bradshaw, 46 Ga. App. 143, 149, 167 S.E.2d 119 (1932). The term "... owner or occupier has also been held to include an individual responsible for "... ensuring compliance with laws, ordinances, and regulations, and inspecting, maintaining, and repairing the premises" on behalf of the owner Norman v. Jones Lang Lasalle Americans, Inc., 277 Ga. App. 621, 627 S.E.2d 382 (2006).

Supervisors, managers, assistant managers, and foremen have also been recognized as having potential liability as an "... owner or occupier" under O.C.GA. §51-3-1 and interpretive case law *See*, Lee v. Myers, 189 Ga. App. 87,

6

374 S.E.2d 797 (1988)(finding that the manager of a farmer's market had a duty to exercise care in maintain the premises pursuant to O.C.G.A. §51-3-1); Mason v. Chateau, 280 Ga. App. 106, 633 S.E.2d 426 (2006)(allowing a lawsuit to proceed against manager of trailer park); Coffer v. Bradshaw, 46 Ga. App. 143, 149, 167 S.E.2d 119 (1932)(proper cause of action set forth against manager, assistant manager, superintendent, and foremen pursuant to Ga. Civ. Code § 4420 [predecessor to O.C.G.A. 51-3-1]).

In addition to statutory liability under O.C.G.A. 51-3-1, an individual can also be held liable under Georgia law for failure to keep the premises safe under the doctrines of common law misfeasance and active negligence. An agent can be individually liable for his or her actions involving misfeasance. Reed v. Arrington-Blount Ford, Inc., 148 Ga.App. 595, 597, 252 S.E.2d 13 (1979); Evans v. Dennis, 203 Ga. 232, 235, 46 S.E.2d 122 (1948)("an agent is personally liable to those injured by his misfeasance"); Owens v. Nichols, 139 Ga. 475, 477, 77 S.E. 635 (1913).

Where an agent fails to use reasonable care or diligence in the performance of his duty, he will be personally liable to a third person that is injured by such misfeasance. Coffer v. Bradshaw, 46 Ga. App. 143, 147, 167 S.E.2d 119 (1932).

7

The agent's liability is not based upon his agency but upon the ground that he is a wrongdoer and is responsible for any injury that he may cause. *Id.* Misfeasance is the improper performance of an actor duty by an agent on behalf of his principal. It may also involve to some extent the idea of not doing, such as where an agent is engaged in the performance of his undertaking does not do something which it is his duty to do under the circumstance, or does not take hat precaution or exercise that care which a due regard to the rights of others requires. *Id.* The agent is responsible for any harm caused to a third party to the same extent as if he had committed the wrong on his own behalf. *Id.*

As discussed hereinabove, Tiffany Roy testified that she was on duty and serving as the Manager in Charge at the time Plaintiff slipped and fell. (Tiffany Roy Deposition, pp. 16 and 19.) As Manager in Charge, Ms. Roy was responsible for checking and ensuring that the floors of the store were clean and free of foreign substances and hazards, including the dairy aisle where Plaintiff slipped and fell. (*Id.* at pp. 21-22 and 99-103; Deposition Exhibit 23.) Therefore, Ms. Roy is potentially liable to Plaintiff pursuant to O.C.GA. 51-3-1 and common law misfeasance, and should be added as a Party Defendant.

8

In addition, Garrett Peterson testified that he was on duty at the time Plaintiff slipped and fell. (*Id.* at p. 5.) Upon arriving at work, Manager in Charge Tiffany Roy instructed Mr. Peterson to dust mop the floors for the entire store. (Garrett Peterson Deposition, pp. 30-31; Tiffany Roy Deposition, p. 124.) Approximately four (4) minutes before Plaintiff slipped and fell in the dairy aisle, Mr Peterson dust mopped down the middle of that aisle only. Mr. Peterson did not dust mop the area of the aisle in which Plaintiff slipped and fell. (Garrett Peterson Deposition, pp. 22-25; Exhibits 17-19 [surveillance video frames].) It was a violation of Publix policy to only dust mop one side of an aisle and a potential safety hazard. (Tiffany Roy Deposition, p. 83.) Mr. Peterson is potentially liable to Plaintiff under the doctrines of common law misfeasance and active negligence,and thus should be added as a Party Defendant.

When considering these issues in the context of fraudulent joinder, Georgia's U.S. District Courts have also consistently found that store managers are proper Party Defendants in premises liability cases. *See*, Ott v. Wal-Mart Stores, Inc., 2010 U.S. Dist. LEXIS 13072, 2010 WL 582576 (M.D. Ga., Feb. 16, 2010)(causes of action for common law misfeasance and O.C.G.A. 51-3-1 statutory liability); Stephens v. Wal-Mart Stores East, LP, 2010 WL 1487213 (M.D. Ga., Apr. 12,

2010) (causes of action for negligence and O.C.G.A. 51-3-1 statutory liability);

Parker v. Goshen Realty Corp., 2011 U.S. Dist. LEXIS 82845, 2011 WL 3236095

(M.D. Ga., Jul. 28 2011) )(causes of action for active negligence, common law

misfeasance, and O.C.G.A. 51-3-1 statutory liability); Poll v. Dell Management,

Inc., 2007 U.S. Dist. LEXIS 62564, 2007 WL 2460769 (N.D. Ga., Aug. 24, 2007)

)(causes of action for active negligence and O.C.G.A. 51-3-1 statutory liability).

Although the foregoing cases dealt with store managers, in the context of common

law claims for misfeasance and active negligence, none of the Georgia case law

relied upon by the District Courts have placed any limitations on the status of an

employee agent who is subject to liability under these doctrines.

### III.     CONCLUSION

For the reasons set forth hereinabove, Plaintiff Robin Houston respectfully

requests that this Honorable Court grant her Motion for Leave to Add as Party

Defendants Tiffany Roy and Garrett Peterson.

Respectfully submitted.

/s/Keith E. Fryer
Attorney for Plaintiff
Georgia Bar No. 279037

FRYER, SHUSTER & LESTER, P.C.
1050 Crown Pointe Parkway, Suite 410
Atlanta, Georgia 30338 – 770-668-9300


                                        /s/  Bruce Berger
                                        Co-Counsel For Plaintiff
                                        Georgia Bar No. 054250

BERGER LAW FIRM
Two Ravinia Drive, Suite 500
Atlanta, GA 30346
404-239-9171



                                        /s/ Michael Watson
                                        Co-Counsel for Plaintiff
                                        Georgia Bar No. 741526,

WATSON LAW FIRM
1177 Gavinwood Place
Decatur, Georgia 30033
404-275-9356


THIS IS TO CERTIFY that, pursuant to LR 5.1B, NDGa., the above document was

prepared in Times New Roman, 14 pt.

11

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROBIN HOUSTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION |
| | ) | FILE NO.  1:13-cv-00206-TWT |
| PUBLIX SUPER MARKETS, INC. | ) | |
| TIFFANY ROY, AND GARRETT | ) | |
| PETERSON, JOINTLY AND | ) | |
| AND SEVERALLY, | ) | |
| | ) | JUDGE:  Thrash |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF ROBIN HOUSTON'S**
**FIRST AMENDMENT TO COMPLAINT**

COMES NOW Plaintiff Robin Houston and files her First Amendment to

Complaint and shows this Honorable Court the following:

1.

Defendant Publix Super Markets, Inc. is a Florida Corporation, a named

Defendant in the instant action and Summons and a copy of Plaintiff's First

Amendment to Complaint and additional pleadings may be served upon it through

its counsel of record Gene Major, Richard Brown, Fain Major & Brennan,  P.C.

Suite 500, 100 Glenridge Point Parkway Atlanta, Georgia 30342.

2.

Newly added Defendant Tiffany Roy is a resident of the State of Georgia, subject to the jurisdiction and venue of this Court, and Summons and a copy of Plaintiff's First Amendment to Complaint and additional pleadings may be served upon her in a manner provided by law.

3.

Newly added Defendant Garrett Peterson is a resident of the State of Georgia, subject to the jurisdiction and venue of this Court, and Summons and a copy of Plaintiff's First Amendment to Complaint and additional pleadings may be served upon him in a manner provided by law.

4.

On July 24, 2012, Plaintiff Robin Houston was an invited customer at the Publix Super Market Store No. 1054 located in Henry County, Georgia.

5.

While walking down Aisle 13 F (the dairy Aisle) Plaintiff Robin Houston slipped and fell onto her left arm, back, neck and head.

6.

The slip and fall was captured on surveillance video from a camera directed to Aisle 13 F and maintained by Defendant Publix Super Markets, Inc.

7.

As result of Plaintiff Robin Houston's slipping and falling striking her left arm, back, neck and head, Plaintiff Robin Houston sustained personal injuries including, but not limited to disc injuries to her neck requiring surgery, injury to her shoulder requiring surgery, and injury to her head resulting in cognitive impairment from post-concussive syndrome.

8.

As a result of the injuries suffered by Plaintiff Robin Houston, Plaintiff Robin Houston has incurred hospital, medical and prescriptive expenses in an amount in excess of $233,000.00.

9.

As a result of suffering her injuries, Plaintiff Robin Houston has been disabled from her employment as a Pre-Certification Specialist with Cancer Centers and from July, 2012 through the filing of this First Amendment to Complaint Plaintiff Robin Houston claims lost wages in an amount not less than $55,176.00 (76 weeks X $726.00 per week = $55,176.60).

10.

At all times relevant to Plaintiff's First Amendment to Complaint, newly added Defendant Tiffany Roy was MIC of the Publix Super Market, Inc.'s premises and supervised certain employees on duty on the morning of July 24, 2012.

11.

As MIC, newly added Defendant Tiffany Roy was responsible for inspection, care, and maintenance of the floor in Aisle 13 F to keep it free of slip hazards.

12.

At all times relevant to Plaintiff's First Amendment to Complaint, newly added Defendant Garrett Peterson was employed by Defendant Publix Super Markets, Inc. as a Front Service Clerk and on July 24, 2012 was directed by newly added Defendant Tiffany Roy, to dust mop Aisle 13 F on the morning of Plaintiff's slip and fall.

13.

At all times relevant to Plaintiff's First Amendment to Complaint, Defendant Publix Super Markets, Inc. had in force policies and procedures directing proper methods of dust mopping Aisle floors which required the dust mopper to proceed down one side of the Aisle and up the other side of the Aisle to insure full coverage of the mopped area.

14.

On the morning of July 24, 2012, prior to Plaintiff Robin Houston's slip and fall, newly added Defendant Garrett Peterson failed to follow the policies and procedures of dust mopping the entire floors of the store and in particular did not dust mop the area of the floor of Aisle 13 F where Plaintiff Robin Houston slipped and fell.

## COUNT ONE

## (Claim Against Publix Super Markets, Inc.)

15.

Plaintiff Robin Houston incorporates the factual and jurisdictional allegations in paragraphs 1 through 14 as if fully set forth hereinabove.

16.

Defendant Publix Super Markets, Inc. had a duty under O.C.G.A. § 51-3-1 to maintain its premises in a safe condition in particular to keep the floor in Aisle 13 F free and clear of slip hazards on the morning of July 24, 2012.

17.

As part of its duty to keep the premises safe from slip and fall hazards, Defendant Publix Super Markets, Inc. had a duty to create, maintain, and employ inspection procedures at the time of Plaintiff's slip and fall which were actually followed and which were adequate to guard against known or foreseeable dangers to patrons of the store.

18.

At the time of Plaintiff Robin Houston's slip and fall, Defendant Publix Super Markets, Inc. employed an inspection procedure known as "Don't Pass it Up, Pick it Up" which did not include regular inspections, times or duties, and which did not require the preparation of any written records verifying timely and regular floor inspections, timely and regular floor sweeps, and timely and regular floor cleaning.

19.

Because Defendant Publix Super Markets, Inc. failed to employ a

reasonable and adequate inspection procedure, Defendant Publix Super Markets,

Inc. is charged with constructive knowledge of the wet substance which caused

Plaintiff Robin Houston's slip and fall.

20.

Defendant Publix Super Markets, Inc. is liable for general and special

damages in an amount to be proven at trial for its negligence in failing to maintain

safe premises and in failing to employ a reasonable and adequate inspection

procedure with regular inspection times and methods.

## COUNT TWO

## (CLAIM AGAINST TIFFANY ROY)

21.

Plaintiff Robin Houston incorporates the factual and jurisdictional

allegations of paragraphs 1 through 20 as if fully set forth herein below.

22.

At all times relevant to Plaintiff Robin Houston's First Amendment to

Complaint, newly added Defendant Tiffany Roy, as MIC of the Publix Super

Markets, Inc.'s premises on the morning of July 24, 2012, had a duty to keep the

floor in Aisle 13F in a safe condition and was required pursuant to Publix's

Policies and Procedures to inspect the floor in Aisle 13 F for slip hazards and this

duty extended in favor of invitees such as Plaintiff Robin Houston.

23.

On the morning of July 24, 2012, newly added Defendant Tiffany Roy conducted an inadequate and cursory inspection of the floor in Aisle 13 F prior to Plaintiff Robin Houston's slip and fall.

24.

At the time of her walk-through of Aisle 13 F on the morning of July 24, 2012 prior to Plaintiff Robin Houston's slip and fall, newly added Defendant Tiffany Roy was distracted from her inspection by her juggling a bottle of milk while walking up Aisle 13 F and her failure to perform an adequate floor inspection resulted in Plaintiff Robin Houston slipping and falling on a wet substance on the floor of Aisle 13 F.

25.

As MIC on the morning of July 24, 2012, newly added Defendant Tiffany Roy also had a duty to supervise Front Service Clerk and newly added Defendant Garrett Peterson to insure that newly added Defendant Garrett Peterson carried out his duties in compliance with Publix's Policies and Procedures and safe operating practices.

26.

Newly added Defendant Tiffany Roy failed to properly supervise, train and instruct newly added Defendant Garrett Peterson in the proper methods of floor cleaning on and before July 24, 2012 which proximately resulted in newly added

Defendant Garrett Peterson negligently performing dust mopping in Aisle 13 F on the morning of July 24, 2012.

## COUNT THREE

## (CLAIM AGAINST GARRETT PETERSON)

27.

Plaintiff Robin Houston incorporates the factual and jurisdictional allegations of paragraphs 1 through 26 as if fully set forth herein below.

28.

Newly added Defendant Garrett Peterson had a duty to dust mop Aisle 13 F on the morning of July 24, 2012 in a manner consistent with Publix's Policies and Procedures and in accordance with the safe operating practices.

29.

Newly added Defendant Garrett Peterson has admitted under oath that he did not comply with Publix's Policies and Procedures on the morning of July 24, 2012 when he dust mopped only the center of Aisle 13 F prior to Plaintiff Robin Houston's slip and fall.

30.

Additionally, newly added Defendant Garrett Peterson has admitted under oath that he did not dust mop the area of the floor in Aisle 13 F where Plaintiff Robin Houston slipped and fell.

31.

Had newly added Defendant Garrett Peterson dust mopped Aisle 13 F in accordance with Publix's Policies and Procedures more likely than not the dust mop would have received a tactile response which would have caused newly added Defendant Garrett Peterson to become aware of a slip hazard on the floor near the cooler in Aisle 13 F where Plaintiff Robin Houston slipped and fell.

32.

At all times relevant to Plaintiff's First Amendment to Complaint, newly added Defendant Garrett Peterson was counseled for an "I Don't Care Attitude" regarding his work performance at Defendant Publix Super Markets, Inc. and Defendant Publix Super Markets, Inc.'s failure to closely monitor and supervise newly added Defendant Garrett Peterson's activities on the morning on July 24, 2012 was a proximate cause of Plaintiff Robin Houston's serious and disabling injuries.

33.

Newly added Defendant Garrett Peterson is liable to Plaintiff Robin Houston for general and special damages in an amount to be proven at trial for his negligence in breaching his duty to follow safe cleaning practices instituted by his employer which were in effect on the date of Plaintiff Robin Houston's slip and fall injury.

WHEREFORE Plaintiff Robin Houston respectfully requests the following relief:

A. That Summons Issue and Defendant Publix Super Markets, Inc. be served with Plaintiff's First Amendment to Complaint in a manner provided by law;

B. That Summons Issue and Defendant Tiffany Roy be served with Plaintiff's First Amendment to Complaint in a manner provided by law; and

C. That Summons Issue and Defendant Garrett Peterson be served with Plaintiff's First Amendment to Complaint in a manner provided by law;

D. That Plaintiff have a trial by jury of the issues created in this case; and

E. That Plaintiff have such other and further relief as deemed just and equitable under the circumstances.

Respectfully submitted .

/s/Keith E. Fryer
Attorney for Plaintiff
Georgia Bar No. 279037

FRYER, SHUSTER & LESTER, P.C.
1050 Crown Pointe Parkway, Suite 410
Atlanta, Georgia 30338 – 770-668-9300

/s/ Bruce Berger
Co-Counsel For Plaintiff
Georgia Bar No. 054250

BERGER LAW FIRM
Two Ravinia Drive, Suite 500
Atlanta, GA 30346
404-239-9171

/s/ Michael Watson
Co-Counsel for Plaintiff
Georgia Bar No. 741526,

WATSON LAW FIRM
1177 Gavinwood Place
Decatur, Georgia 30033
404-275-9356

THIS IS TO CERTIFY that, pursuant to LR 5.1B, NDGa., the above document was prepared in Times New Roman, 14 pt.

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COPY

ROBIN HOUSTON,                    )
                                  )
              Plaintiff,          )
                                  ) Civil Action File
         vs.                      ) No. 1:13-CV-00206TWT
                                  )
                                  )
PUBLIX SUPERMARKETS, INC.,        )
                                  )
              Defendant.          )

- - -

Videotaped and stenographically transcribed deposition of **TIFFANY ROY**, taken on behalf of the Plaintiff, pursuant to all stipulations contained herein, before Susan E. Houlton, Certified Court Reporter and Notary Public, at 100 Glenridge Point Parkway, Suite 500, Atlanta, Georgia, on Thursday, December 5, 2013, commencing at 2:36 p.m.

- - -

Susan Houlton Reporting, Ltd.
P.O. Box 20288
Atlanta, GA  30325-0288
(404) 350-8555

7

```
1        A      That all I can --
2        Q      -- as far as you know --
3        A      -- think of right now, yes.
4        Q      Okay.  Can you tell me about your
5    education?
6        A      I have a high school diploma.
7        Q      From where?
8        A      North Cobb High School.
9        Q      North Cobb?
10       A      Yes, sir.
11       Q      And any college, junior college?
12       A      No, sir.
13       Q      When did you graduate from Cobb High?
14       A      2000.
15       Q      This is of those I warned you about
16   earlier:  Have you ever been -- have you ever pled
17   guilty or been convicted of a felony or a
18   misdemeanor?
19       A      No, sir.
20       Q      Okay.  Are you married?
21       A      Yes, sir.
22       Q      What's your husband name?
23       A      William Roy.
24       Q      How long have you been married?
25       A      Ten years.
```

16

1    customers.

2         Q    Is that provided on the job?  We're still

3    talking on the job?

4         A    On-the-job training, that's a CBT.  The

5    main portion of that is a CBT, which is the computer-

6    based training module that you do.  As far as on the

7    job, you still have to go through on-the-job training

8    regarding safety.

9         Q    Now, CBT training, was that during the

10   orientation process --

11        A    -- no --

12        Q    -- or is that after?

13        A    That's after.  That's back at the store.

14        Q    Okay, my understanding is -- so I'm sure

15   you're aware of the accident that we're here to talk

16   about today, Ms. Houston's fall occurred on July 24,

17   2012?

18        A    Yes, sir.

19        Q    My understanding is you, at that -- on that

20   date you were an Assistant Customer Service Manager?

21        A    Yes, sir.

22        Q    How long had you been an Assistant Customer

23   Service Manager?

24        A    A little over a year.

25        Q    Who was the Customer Service Manager on the

1   had any type of floor inspections?

2          A     At CVS?

3          Q     Yes.

4          A     I have no idea.

5          Q     At the time of the accident, July 24, 2012,

6   can you tell me what your duties as the Customer

7   Service Manager included?

8          A     At that time I was the manager in charge.

9          Q     When you say, at that time, you mean on the

10  day of the accident?

11         A     For that morning.

12         Q     Okay.

13         A     Yes, sir.

14         Q     So the morning of the fall you were the

15  manager in charge?

16         A     Yes, sir.

17         Q     For just part of the morning or --

18         A     -- without looking at a schedule, I

19  couldn't tell you.  It's based on, I guess -- I don't

20  know you would -- it's not really seniority, but if

21  the store manager were to come in or the assistant

22  store manager, they take over the manager in charge

23  role.

24         Q     But you were the MIC at the time the

25  accident occurred?

1    making sure that they're -- they're following what

2    their job description and guidelines are as well.

3         Q    Which categories or job classes of

4    associates would the Customer Service Department be

5    over?

6         A    Front Service Clerk, Cashiers, Customer

7    Service staff, the Customer Service Team Leader.  At

8    that time we had a position that we called

9    Administrative Coordinator; also the Aprons Meal

10   Clerk.

11        Q    Aprons?

12        A    Aprons Meal Clerk.

13        Q    What are those?

14        A    Um, we have a -- most stores have a kiosk

15   where we provide quick, easy recipe ideas for our

16   customers, and the meal clerks are there

17   demonstrating the recipe.

18        Q    Now, as manager in charge on the morning of

19   the incident, what would your duties have been there?

20        A    It would have been, because I was the

21   opening manager, ensuring that each department had

22   associates in position and ready when the store

23   opened; making sure that the sales floor was clean;

24   making sure that we were pretty much ready for

25   opening.  We kind of look at it every day should be

1   like a grand opening.  Everything should be in its

2   place.  Nothing out of order.  The departments should

3   have all their associates in place to take care of

4   the customers.  Plus, the MIC are walking the store,

5   making sure that that's taking place; making sure

6   that there's no hazards or no product that's empty on

7   the shelf that needs to be filled and that type of

8   thing.

9       Q    Now, in the Supplemental Responses to our

10  Interrogatories or written questions, Publix has

11  indicated that you clocked into work that day at

12  5:59 a.m.  Would that be accurate?

13      A    Yes, sir.

14      Q    Okay.  As far as you know?

15      A    As far as I know.

16      Q    When you say, walking the store, was

17  that -- what was your purpose when you walked the

18  store that morning?

19      A    The first thing that you do when you open

20  is come in.  I just kind of make sure that the doors

21  are secure on the front end; make sure that

22  refrigeration is checked.  We check the temperatures.

23  We check the -- I guess all the coolers; make sure

24  that the temperatures are running properly both on

25  the sales floor and in the back rooms.  Also, like I

41

1     Q     Let's be specific to Garrett Peterson.   He

2   was hired and trained as a Front Service Clerk,

3   correct?

4     A     Yes, that is correct.

5     Q     Would the training have been the same for

6   every Front Service Clerk that you hired?

7     A     Yes, sir, it would have been.

8     Q     Okay.

9     A     The on-the-job part -- the initial training

10   would have been the same, correct.

11    Q     Right.

12    A     If, by any chance, one associate needed a

13   little more attention on the bagging or a little more

14   instruction, then, we would have given it to them.

15    Q     Mr. Peterson, did he require anything

16   outside the norm?

17    A     No, sir.

18    Q     No more, no less?

19    A     No, sir.

20    Q     And do you know approximately how much

21   training that would have been; a week, two weeks?

22    A     No, sir.

23    Q     Does the supervisor, whether yourself as

24   the Assistant Customer Service manager, or

25   Mr. Jackson, a Customer Service Manager during that

1    on-the-job training period, do you kind of shadow him

2    to make sure that he's doing things properly?

3         A    I wouldn't say, shadow, but we do observe

4    them.  We do monitor their progress to determine

5    whether or not they need additional training.  That

6    would be our -- I guess our responsibility to not

7    only the customers, but not that associate to set

8    them up for -- to excel in their job because we don't

9    want to ever set an associate up to fail.

10        Q    Is it anything formal or you just kind of

11   keep an eye out as he does the different tasks during

12   the day?

13        A    Just monitoring them, yes, sir.  The formal

14   training comes in the form of the CBTs.

15        Q    Okay.  The shadowing --

16        A    -- um-hum --

17        Q    -- and let's stick with Mr. Peterson.  When

18   he -- when he's shadowing somebody, he's following

19   around another Front Service Clerk watching them do

20   these tasks, and then he does it or is it the other

21   way around?

22        A    Typically it is we show them first how to

23   do the job and then we let them do the job.  And then

24   we talk to them about the job and ask them if they

25   have any questions.  So that way we know that they

1    have an understanding of what their responsibilities

2    are, and whether it be the manager or the associate,

3    they're shadowing with was typically the policy.

4        Q     So are you -- you're relying more heavily

5    on the person they're shadowing -- that they're

6    shadowing?

7        A     As far as the showing that person, yes, we

8    allow them to show them what to do.  When we choose

9    the associate that we pair them with, that is

10   something that's prescheduled.  We schedule them with

11   an associate that excels in the job class, someone

12   who we feel confident will train them correctly.

13       Q     The person that's training, that would have

14   been training Mr. Peterson --

15       A     -- um-hum --

16       Q     -- did they document any -- any of that

17   whatsoever?

18       A     No, sir.

19       Q     If there are any concerns about them not

20   performing tasks in a proper manner or, you know, per

21   Publix policy, is that documented?

22       A     It's not, no, sir, it's not documented.

23   They just tell the management about it.  And so that

24   way we can give them more training in that area.

25   They're not left alone during that time --

44

1    Q    -- how long --

2    A    -- per se.

3    Q    One more time.  How long a period would

4    that be?  I mean, just -- is it a range?

5    A    Generally we give them -- generally we give

6    them, a minimum, a week of shadowing; a week, maybe

7    three days.  It might be five days.  It depends on

8    how often they're scheduled.  But we generally do try

9    to give them several shifts where they're -- where

10   they're shadowing someone until they're comfortable.

11   But I can't say a week, two weeks.  It's just -- it

12   shifts.  It's not a time frame.

13   Q    So Mr. Peterson testified yesterday that he

14   was working, on the average, about 30 hours a week so

15   --

16   A    -- at that time probably so, yes, sir.

17   Q    So his shadowing would have been,

18   presumably for, about 30 hours' worth, about one

19   week?

20   A    Relatively so, yes, sir.

21   Q    Okay.  The person they're shadowing with,

22   is that the person that would provide them feedback

23   and critique, or I guess you guys call it coaching

24   and counseling?

25   A    They do coach them along the way.  They

1      Q    So when they in they're supposed to grab a

2   paper towel and pop it in their pocket and carry it

3   around with them?

4      A    This is the practice, yes, sir.

5      Q    Okay.  Is it true -- is it an accurate

6   statement that Publix policy requires using a dust

7   mop to slowly sweep each aisle on both sides?

8      A    Yes, sir, that's the policy.

9      Q    Okay.  And is it also Publix -- does Publix

10  policy require associates to always follow documented

11  procedures for caring for the floors in the store

12  without taking any shortcuts?

13     A    That's the policy, yes, sir.

14     Q    Okay, if you're performing a visual

15  inspection of the store -- okay, I'll tell you this:

16  Yesterday when Mr. Peterson was being deposed, we

17  asked him about -- Mr. -- my co-counsel, Mr. Fryer,

18  asked him about inspecting -- floor inspections.

19          And he testified to the effect that he

20  would walk past the end of an aisle, look down the

21  aisle and -- you know, from one end all the way down

22  the aisle looking for safety hazards on the floor,

23  and then continue on to the next aisle when he was

24  dust mopping.  If you take a shortcut such as that

25  where you're performing a visual inspection from one

1          that would be amiss because the store was

2          already properly cleaned.

3          Q     (By Mr. Watson)  Okay.  And you testified

4     earlier that you clocked in at six a.m., and that you

5     performed your walk-through, and that 15 minutes of

6     that was floor inspections?

7          A     Yes, sir.

8          Q     And that the total time you spent on the

9     combined walk-through was 30 minutes.  So that takes

10    us to 6:30, correct?

11         A     Yes, sir, that is correct, roughly.

12         Q     So -- and, then, Mr. Beauvais' testimony

13    earlier today was he clocked in at five a.m. and

14    performed a walk-through inspection of the entire

15    store in 15 minutes, which puts him arguably -- well,

16    if he went straight out, you know, between 5:16 and

17    5:20.  So from the time you completed yours, it's at

18    least an hour until he clocked in so there's --

19    there's a lot going on during that time, correct?

20         A     There -- there -- it's a possibility, yes,

21    sir.

22         Q     Would you agree that proper sweeping

23    procedure is to start on one side of the store and

24    sweep each consecutive aisle?

25         A     I would say, yes, you want to make sure you

1    go up and down every aisle.

2         Q    Okay.  You've answered this.  This is a

3    little bit more specific so I'm just -- I'm going to

4    go ahead and ask it again.  Would you agree that it's

5    a violation of Publix policy to only dust mop one

6    side of an aisle?

7         A    Yes, sir.

8         Q    Would you agree that dust mopping only one

9    side of the aisle is a potential safety hazard?

10                   MR. BROWN:  Objection.

11                   THE WITNESS:  I would say that it's

12             possible it could be.  However, because the

13             store was already inspected twice that morning,

14             he was specifically looking for anything that

15             could have been out of place.  That's what I

16             told him to do was go check the store and make

17             sure there's nothing -- you know, go do a store

18             sweep, please.

19         Q    (By Mr. Watson)  Did you -- did you tell

20    him that it was okay to only dust one side of the

21    aisle or that it was okay to skip aisles when doing a

22    sweep?

23         A    No, sir, I did not.

24         Q    Okay.  So you would also agree that it's a

25    violation of Publix's policy to skip aisles or sweep

1    every other aisle when performing a sweep?

2         A    Yes, sir.

3         Q    Would you also agree that skipping aisles

4    or sweeping every other aisle is potentially

5    undermining safety?

6                   MR. BROWN:  Objection.

7                   THE WITNESS:  I would say it's a

8              violation of policy.  I would say that it is

9              possible that a hazard -- by skipping the

10             aisles, there could be a hazard there.  Do I

11             think it's undermining?  I don't think that.  I

12             just think that was a poor, poor choice and he

13             violated policy.

14        Q    (By Mr. Watson)  It could create a risk?

15                  MR. BROWN:  Objection.

16                  THE WITNESS:  It's possible, yes.

17        Q    (By Mr. Watson)  Would you also agree that

18   Publix's -- Publix's written safety policies and

19   procedures, those are not discretionary, correct?

20        A    That's correct.

21        Q    Would you also agree that Publix's policy

22   requires managers and assistant managers such as

23   yourself to ensure that all safety policies and

24   procedures are followed?

25        A    That is correct.

1    Q    Okay, so the same float could be used to

2    stock both frozen food, dairy display, paper goods

3    aisle?

4    A    It is possible, yes.

5    Q    Okay.  I'd like to show you what has

6    previously been marked as Plaintiff's Exhibit 15.

7    It's titled, Frozen Food Tour and Practice, and then

8    it's also a Continued page.

9    A    (Witness complies.)

10   Q    And if you'll look at the -- I guess

11   this -- this appears to be part of the training

12   package.  And if you could just -- well, read the

13   last sentence, if you would, please.

14   A    Also explain that he or she should place a

15   rug under floats stocked with frozen product to

16   prevent water on the sales floor.

17   Q    Is that a common practice at Store 2 --

18   1054?

19   A    Um, honestly, I'm on the front end most of

20   the time.  I do act in a manager in charge role.

21   However, I -- not as frequently as I used to, and I

22   cannot answer you a hundred percent if that is a

23   common practice in our store with the Frozen Food

24   Department.

25   Q    Okay.  It's a Publix policy --

(Video on.)

Q      (By Mr. Watson)   Prior to opening on
July 24, 2012, did you walk the store, the entire
store, once or twice?

A      I typically walk the entire store once.   I
did the perimeter in the morning.  I do -- I come in
and my typical path when I come in is I go -- once I
clock in and go in and make sure everything's good in
the computer and we check email, we walk
refrigeration.  I typically walk through the lobby
and then make my way around the perimeter of the
store checking the coolers in the back and the open-
face refrigeration units on the sale floor.  And
during that time when I'm checking the refrigeration,
I'm also looking for anything that's out of place on
the floor as well or sometimes there's things that
are left in the refrigeration cases.  And those
things I'll collect and put back.

        Once the refrigeration check is complete,
that's when I begin to walk the aisles and check, you
know, for detailing any type of hazards on the floor.

Q      Okay.

A      And that sort of thing.

Q      And you start at one end -- would it be
accurate to say you start at one side of the store on

93

1      that aspect of it, detailing --

2          A      -- on that --

3          Q      -- stock and hazards, that you start on one

4      side and just go --

5          A      -- across.

6          Q      Across?

7          A      Yes, sir.

8          Q      Okay.  Not a trick question, but -- and I'm

9      not sure.  I want to make -- I want to make certain,

10     but I didn't see a definition of inspection in the

11     policies and procedures.  But do you know if floor

12     inspections are defined, per se, in the policies and

13     procedures?

14         A      I don't know if there's a definition that

15     defines specifically floor hazards.  As far as policy

16     goes, written policy, I'm not certain a hundred

17     percent what definitions lay out.

18         Q      But, I mean, when I -- and I want to make

19     sure.  You said, floor hazards.  I'm talking about a

20     floor inspection.

21         A      Um-hum.

22         Q      Is a floor inspection or the procedure for

23     a floor inspection laid out?

24         A      In a written policy?

25         Q      Yes, ma'am.

94

1        A      I don't know.

2        Q      Okay.

3        A      I don't know.

4        Q      All right.  Now, the Don't -- Don't Pass it

5   Up, Pick it Up policy, I think I've got a grasp of

6   that.  But is it an accurate statement that any time

7   a Publix associate walks down an aisle employing that

8   policy, they're -- they're covering it all.  I mean,

9   they're looking for floor hazards, merchandise that

10  may be set on the floor or just, you know, somebody's

11  grabbed something in one department and just left it?

12  I mean, does it encompass all of that?

13       A      I would say as far as the Don't Pass it Up,

14  Pick it Up policy, when we're walking and doing an

15  inspection, it's more for items that are left, that

16  something was left on the floor.  Or if there was a

17  piece of paper on the floor, a spill, or it could be,

18  you know, a piece of candy, that policy is more

19  focused on that, not so much the detailing and the

20  go-backs that could be left on a shelf somewhere.

21       Q      Okay.  But it encompasses a floor

22  inspection?

23       A      Yes, sir.

24       Q      I mean, you're looking for floor hazards,

25  you know, whether it's -- whether's it's a spill,

1    whether it's merchandise that's been left on the

2    ground, whether it's a kid that's dropped a, you

3    know, a sucker?  I mean --

4         A    -- yes, sir --

5         Q    -- is that accurate?

6         A    Yes, sir, it is.

7         Q    Okay.  So in theory or in practice,

8    actually -- not in theory, but in practice, when --

9    every time you walk down an aisle as a Publix

10   associate, that's what you're supposed to be doing?

11        A    Yes, sir, that's correct.

12        Q    All of those?

13        A    That's correct.

14        Q    Okay.  Now, with respect to display

15   cases -- and I want to focus, I guess, really on the

16   dairy aisle display cases -- my understanding is

17   Publix policy is that those cases, the ones,

18   particularly, where milk and eggs are stored, that

19   those should be cleaned once a week.  Would that be

20   accurate?

21        A    I'm not sure what the policy is on that.

22        Q    Okay.  This has been previous -- this is

23   what I was getting ready to ask you about right

24   before we took a break.  It's Plaintiff's Exhibit 16.

25   It's Display Cases and Walk-in Coolers, Continued.

1   That looks to be, you know, one of the training

2   modules.  And if you would look at the -- and I think

3   that it's already highlighted.  It's the Q and A on

4   1.  And I'll go ahead and read it.  How often should

5   you clean the milk and egg display case?  And the

6   answer is one in bold, correct?

7        A     Yes, sir.

8        Q     And that is?

9        A     Once a week.

10       Q     Okay.  Then, what's the notation underneath

11   there which --

12       A     -- it says, milk and egg products are more

13   susceptible to leaks and breakage than other

14   products.

15       Q     And, so, would it be an accurate statement

16   that that is a purpose of cleaning those particular

17   display cases once a week, because of the

18   susceptibility of eggs or milk to break or leak?

19       A     I would say, yes, that's --

20       Q     -- and if they do, it's a potential safety

21   hazard?

22       A     I would say if they break or leak in the

23   case, that the cases are contained and --

24       Q     -- right --

25       A     -- they're not going to leak on the floor.

1       Q    But that wouldn't be the purpose of that;

2   that's not a safety hazard, right?

3       A    I don't necessarily think it's a safety

4   hazard, as far as that.  I do think it is a safety

5   hazard as far as raw eggs getting on other product.

6       Q    Would you agree that if a -- if a milk

7   carton leaks in a display case and a customer comes

8   in and picks it up and takes it out, if it's been --

9   if one -- if it's sitting -- you know, if it's

10   leaking or one next to it's leaking, and they pick it

11   up and take it out, there's potential of some -- you

12   know, a drop or two or three of milk to fall on the

13   floor?

14                MR. BROWN:  Objection.

15                THE WITNESS:  I would say that if that

16       were to happen, that it is a potential

17       possibility that it could drip on the floor,

18       yes.

19       Q    (By Mr. Watson)  That could happen?

20       A    Absolutely.

21       Q    If it does, that's a safety hazard,

22   correct?

23       A    It would be, yes.

24       Q    And it would be -- and it would be a

25   potential fall hazard?

1    A    Potentially, yes.

2    Q    Okay, thank you.  Do you -- I don't

3  think -- do you remember the person, the Front

4  Service Clerk, that you said was such a good employee

5  that Garrett Peterson shadowed with?

6    A    That time, no, sir.

7    Q    Okay.  Earlier you said you weren't sure

8  the floor inspection is defined, per se, correct?

9    A    Yes, sir.

10    Q    Do you know, though -- can you tell me,

11  according to Publix's policy, what the proper

12  procedure for performing floor inspection would be?

13    A    I don't know what the policy states.  I

14  know when I went through my manager-in-charge

15  training, they really emphasized the Don't Pass it

16  Up, Pick it Up, by making sure that when you were

17  walking the store in any capacity, whether it's floor

18  inspection or just a general going to pick a product

19  up off the shelf for a customer, going to the back

20  room, going to another department, to continuously be

21  on alert to maintain, you know, anything that could

22  possibly be on the floor, that you pick it up.

23    Q    Okay.  Would you agree that it's the

24  responsibility of each department manager and

25  assistant department manager to inspect the floors

99

1    for foreign substances?

2                    MR. BROWN:  Objection.

3                    THE WITNESS:  I would say that it is

4        not solely their responsible.  It is their

5        responsibility, along with each and every

6        associate that is currently on the clock at

7        Publix at that store at that time.

8                    (Plaintiff's Exhibit No. 23 was

9            marked.)

10   Q    (By Mr. Watson)  I'm going to --

11                   MR. WATSON:  -- we're at 23, correct?

12                   THE COURT REPORTER:  Um-hum.

13   Q    (By Mr. Watson)  This has been marked as

14   Plaintiff's Exhibit 33 {sic}.  The title of the

15   document is Inspection Procedures.

16                   THE COURT REPORTER:  It's 23.

17                   MR. WATSON:  23, I'm sorry.  Thank you

18       for the correction.  Plaintiff's 23.

19   Q    (By Mr. Watson)  The document's titled,

20   Inspection Procedures, Bates No. 25 through 29.

21                   MR. BROWN:  Take your time and read

22       it.

23   Q    (By Mr. Watson)  You are welcome to take

24   time to look this over.  I can tell you, though, that

25   I've -- I looked -- and I'm looking and probably may

1      ask you questions about the first paragraph on

2      Bates 26, the following page, 27, and then on the

3      last page, 29, the -- midway down on the left column

4      there's one that deals with floors and, then,

5      shelves, cases and displays.

6           A     Okay.  (Witness complies.)  Okay.

7           Q     If you look at the front page, it's just

8      the topic overview, there are two categories:

9      Inspection Procedures Overview, and, then, Inspecting

10     the Store.  Would that be accurate?

11          A     Yes, sir.

12          Q     Okay.  And, then, if you will look at Bates

13     page 27.  It's got basically two -- two parts,

14     Manager-in-Charge Responsibilities (throughout the

15     day), and, then, the second section is Department and

16     Assistant Department Manager Responsibilities.  Do

17     you see that?

18          A     Yes.

19          Q     And, then, I don't want to go through every

20     bullet point.  I'm asking specifically about floor

21     inspections.

22          A     Yes, sir.

23          Q     So just read -- and you can read it to

24     yourself, but that first line and then the last

25     bullet point.  The first line, each department -- or

1    the -- each department manager or assistant manager

2    should -- there are four bullet points.  And the

3    final bullet is inspect the floor -- floors, plural,

4    for foreign substances?

5         A    That's correct.

6         Q    Is that accurate?

7         A    Yes, sir.

8         Q    So, based on that, would it be an accurate

9    statement to say that -- that it is the

10   responsibility of each department manager and

11   assistant manager to inspect the floors for foreign

12   substances?

13        A    Yes, it is their responsibility based on

14   that.

15        Q    Okay.

16        A    However --

17        Q    -- and then --

18             MR. BROWN:  -- let --

19             THE WITNESS:  -- however, it's not

20   only their responsibility.

21        Q    (By Mr. Watson)  Right.  Manager-in-charge

22   responsibilities.  And it's -- the lead in is,

23   throughout the day and before the store closes,

24   managers should -- final -- the last major bullet

25   point -- check the following in each department; and,

1   then, the third sub part down is floors for foreign

2   substances, correct?

3       A    That is correct, yes.

4       Q    And, so, based on that policy as that

5   reads, the manager in charge is responsible

6   throughout the day and prior to close for inspecting

7   the floors for foreign substances?

8       A    That is correct, yes.

9       Q    Is there anywhere that you've seen in the

10  inspection -- in this inspection procedures packet

11  where it says that anyone other than those two

12  categories of management are responsible for floor

13  inspections?

14              MR. BROWN:   Asked and answered, but

15          you can ...

16              THE WITNESS:   Um, it actually does

17          state in here -- doesn't specifically say, floor

18          inspections.  However, at the bottom of page 27

19          under the department and assistant department

20          manager responsibilities, there's a note that

21          says, if a department manager or assistant

22          department manager is not scheduled for a

23          particular department, then the associates

24          working in that department are responsible for

25          the overall appearance of the department and

1            taking care of customers and vendors.

2            Q      (By Mr. Watson)   Right.

3            A      So that -- I mean, and that also does

4     apply; the associates in each department are

5     continuously responsible for the overall appearance.

6     The department manager is going to be one the that's

7     held accountable for it.

8            Q      Right.  But that -- that's covered under

9     sub -- under the third bullet point, correct?

10           A      The overall appearance of each department

11    is everything.  It is the appearance of the

12    department.  It is the -- and appearance relates to

13    the floor as well.

14           Q      Is that what that reads?  That third bullet

15    point reads:  Check the overall appearance of their

16    department to make sure that product is available for

17    customers and associates are completing their tasks

18    and meeting Publix service standards?

19           A      That is what the bullet point reads, yes.

20           Q      Right.  But it doesn't say anything in

21    there about inspecting floors is separate and that's

22    not contained in that note, correct?

23           A      That is correct, yes.

24           Q      Okay.  And, then, if you'll look on page

25    29, it also -- that addresses shelves, cases and

1      A      No.

2      Q      What was on the floor?   Was anything on the

3   floor?   Things of that nature?

4      A      No.   When we ask them to fill out a

5   statement, we just ask them to please be very

6   detailed about anything that you may have seen, heard

7   or saw regarding the situation.

8      Q      Okay.   Thank you.

9      A      Um-hum.

10      Q      What time did the store open on July 24,

11   2012?

12      A      For customers or for --

13      Q      -- oh, yes, for the public?

14      A      Publix opens at 7:00 a.m.

15      Q      Okay.   And we're obviously talking about

16   Store 1054?   I might as well say it.

17      A      Yes.

18      Q      On the morning -- on that morning, the date

19   of the incident prior to Ms. Houston's fall, did you

20   provide Garrett Peterson verbal directions on

21   inspection, sweeping and cleaning the store premises?

22      A      The only verbal instructions that I gave

23   him were to do a store sweep.

24      Q      Okay.   And you didn't -- no specifics on

25   the store sweep?

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COPY

ROBIN HOUSTON,                    )
                                 )
              Plaintiff,          )
                                 )Civil Action File
         vs.                     )No. 1:13-CV-00206TWT
                                 )
                                 )
PUBLIX SUPERMARKETS, INC.,        )
                                 )
              Defendant.          )

- - -

Videotaped and stenographically transcribed deposition of **GARRETT PETERSON**, taken on behalf of the Plaintiff, pursuant to all stipulations contained herein, before Susan E. Houlton, Certified Court Reporter and Notary Public, at 100 Glenridge Point Parkway, Suite 500, Atlanta, Georgia, on Wednesday, December 4, 2013, commencing at 3:20 p.m.

- - -

Susan Houlton Reporting, Ltd.
P.O. Box 20288
Atlanta, GA  30325-0288
(404) 350-8555

1    A    I was not.

2    Q    When did you become aware that she had

3    suffered a fall at the Publix store?

4    A    When I came back up the aisle that I had

5    just walked down, I passed by her.  And, Publix, one

6    of our policies is the 10 second 10 feet rule so we

7    engage customers.  So I saw her; asked her how she

8    was doing.  She said she was fine.  And as I -- after

9    I passed her she said, well, I just fell.

10         So I turned around and came back to her and

11   that's when I was first aware.

12   Q    Okay.  And on July 24 of 2012, as I

13   understand it, you had reported to work that day,

14   that morning, at 7:31 a.m.?

15   A    Correct.

16   Q    Is that correct?

17   A    Yes, sir.

18   Q    If you would please give me a verbal

19   response to a question, either yes or no, instead of

20   uh-huh or un-huh or a nodding of the head.  I know

21   we're on video so we know what you're doing, but

22   she's got to type everything down that we say.  Okay?

23   A    Yeah, all right.

24   Q    As I understand it, from 7:31 a.m. you had

25   a break from 9:45 a.m. until 10:17 a.m. that morning?

1    orientation.

2         Q    When were you notified that your employment

3    application had been accepted?

4         A    The week before that.

5         Q    The week before June 30th?

6         A    June 30th, yes, sir.

7         Q    So approximately June the 23rd of 2012?

8         A    Yes.

9         Q    Between June 23 of 2012 and June 30 of

10   2012, when you first went to the store to work, did

11   you undergo any training?

12        A    Yes.

13        Q    By Publix?

14        A    Yes.

15        Q    Okay.  Tell me what training you had

16   between June 23, 2012, and June 30, 2012, when you

17   first went to work at the store?

18        A    I had a two-day orientation process where

19   all the new hires in the county or the district went

20   to one store and we watched videos and were trained

21   on the policies of the company.

22        Q    So you underwent a two-day training?

23        A    Yes.

24        Q    And where was that located?

25        A    It was at the store in Stockbridge.  I'm

9

1    not quite sure of the store number.

2          Q     Okay.

3          A     But it's off North Henry Boulevard.

4          Q     And is that a regular grocery store?

5          A     Yes, yes.

6          Q     And what kind of training did you have

7    during those two days?

8          A     I had -- it was --

9          Q     -- in other words, take me through the

10   first day.

11         A     Okay.  The first day we showed up --

12         Q     -- what time?

13         A     Eight in the morning.

14         Q     And how long did it go?

15         A     The first day was a good eight hours.

16         Q     Okay.

17         A     I think we got out at four or five.

18         Q     All right.

19         A     We went into -- that's -- the reason we

20   went to that store is because that's the only store

21   in the district that's equipped with a training room.

22   And so we all went in there and we had a mediator and

23   she played videos for us the whole day.

24         Q     Okay, I think they call that a facilitator?

25         A     Okay.

10

1      Q      Is that right?

2      A      Yeah.

3      Q      Or you call it a mediator?

4      A      A guide.

5      Q      It was a guy {sic} who played videos --

6      A      -- and gave us -- we had pamphlets and

7  things like that.

8      Q      You had pamphlets?

9      A      (Witness nods head affirmatively.)

10      Q      And what else?

11      A      And he just -- he would -- you know, we had

12  little quizzes after the videos --

13      Q      -- okay --

14      A      -- and stuff like that.

15      Q      Were the quizzes on a computer screen?

16      A      No.

17      Q      So they were handouts?

18      A      They were handouts, yes.

19      Q      And what did the quizzes cover?

20      A      Each quiz covered what the past video had

21  shown.

22      Q      How many videos did you see?

23      A      Upwards of 30.

24      Q      Thirty?

25      A      Thirty.  Yeah, there were a lot.

1      Q      Thirty videos?

2      A      There were a lot.

3      Q      And those videos consisted of what?  What

4      did you see on the video?

5      A      Just different looks at the company.  Like,

6      we had a -- there was a section about the company

7      history.  There was a section about safety, fire

8      safety, all the different safety regulations and

9      things like that.

10     Q      What job did you apply for?

11     A      Just Front -- the title is Front Service

12     Clerk.

13     Q      Front Service Clerk?

14     A      Yes.

15     Q      And what did you understand a Front Service

16     Clerk's duties and responsibilities would be?

17     A      Bagging groceries, cleaning up the store at

18     night, closing.  I did floor care a lot, and cashier

19     when possible or whenever they needed me.

20     Q      Did you learn how to work a cash register

21     during training?

22     A      No, not during training, no.

23     Q      That was on-the-job training?

24     A      That was on-the-job training, yes, sir.

25     Q      Now, you took me through the first day of

1    training where you looked at upwards of 30 videos and

2    you took written tests as a result of seeing the

3    videos; and that lasted about eight hours; that

4    covered subjects that you've just described?

5         A    Yes.

6         Q    And what about the second day of training?

7         A    The second day was more or less the same.

8    It was shorter.   That day we didn't have it until one

9    o'clock in the afternoon --

10        Q    -- right --

11        A    -- because it was on a Sunday.

12        Q    Okay.

13        A    And I want to say we got out around four

14   that day so it was only three or four hours that day.

15   But it just more videos and kind of a summary of what

16   we had learned.

17        Q    Okay.   And with regard to topics of safety,

18   what do you recall in training were sort of the

19   highlights of the safety topics that you were trained

20   to learn about?

21        A    Well, when you talk about safety, you've

22   got, you know, floor safety and also theft safety,

23   theft prevention.   So the 10 feet 10 second rule was

24   a big one because that is a deterrent of theft.   You

25   know, when you're engaging the customer, they're a

13

1   lot less likely to steal from you.

2        Q    Right.

3        A    And then there's also Don't Pass it Up,

4   Pick it Up, which is a another Publix slogan, I'll

5   say.  And that requires you to carry a paper towel in

6   your pocket at all times so that when you past a, you

7   know, spill on the floor or anything on the floor,

8   you can pick it up without having to leave it to go

9   get a paper towel or something to clean it up with.

10       Q    Right.  And we've actually been produced a

11  copy of the Don't Pass it Up, Pick it Up video.  It

12  was four minutes long; is that right?

13       A    Yes, sir.

14       Q    And this is the one that you watched with

15  regard to floor safety?

16       A    Yes, sir.

17       Q    Did you watch any other videos other than

18  the four-minute Don't Pass it Up, Pick it Up video

19  with regard to floor safety or was this the only one?

20       A    As far as floor safety goes?

21       Q    Right.

22       A    We watched videos showing how to clean the

23  floors, how to mop them, sweep them.  But, I mean,

24  that's pretty much the big slogan of how to keep

25  floor safety at Publix.

1    A    Yes.

2    Q    What does that policy say?

3              MR. FRYER:   Steve, we can go back to

4         the witness.

5              THE WITNESS:   It states that when you

6         dust mop the floor, one person takes the dust

7         mop; another takes a regular broom.   And we call

8         it the push and pull method.   The person with

9         the regular broom sweeps from out under the lips

10        of the bottom aisle or the bottom shelf on an

11        aisle, and the dust mop person comes behind them

12      · and sweeps it up on each side of the aisle.

13   Q    (By Mr. Fryer)   Okay.   Let me show you what

14   we've marked as Plaintiff's Exhibit No. 1 that was

15   produced to us by Publix out of the Policy and

16   Procedure Guide to Quality Floor Care.   Let me see

17   if -- look at that document and let me ask you if

18   that looks familiar to you?

19   A    Yes.

20   Q    Did you see that document during your two-

21   day training in the end of June of 2012?

22   A    I do not recall if I saw it in this format.

23   I know I saw that in the videos.   It was covered

24   heavily.   And then also on the job they taught me how

25   to do it.

1    Q    Would the videos that you looked at show

2    the written documents in addition to --

3    A    -- no --

4    Q    -- talking heads?

5    A    Yeah, they'd have like a -- like a little

6    slide with the description like this, and then they'd

7    have, like, people showing how to do it.

8    Q    So this Daily Cleaning, Exhibit 1, could

9    have been on a slide that you would seen during your

10   two-day training?

11   A    Yes.

12   Q    Now, on page 2 of that document -- now, I'm

13   going to reference you down in the bottom right-hand

14   corner of that document, you see that a PBX number?

15   A    Yes.

16   Q    That's called a Bates stamp.  And we're

17   also referring to those Bates stamp numbers.  Bates

18   stamp 52, do you see where it says, Sweeping

19   Guidelines?

20   A    Yes.

21   Q    And does it state, follow these guidelines

22   to keep the store swept throughout the day and before

23   night scrubbing?

24   A    Yes.

25   Q    And the first bullet point there, does it

21

1   say, use a dust mop to slowly sweep each aisle on

2   both sides and then use a corn broom to sweep the

3   dirt into a dustpan; discard immediately?

4       A    Yes.

5       Q    Did I read that right?

6       A    Yes.

7       Q    And why does it say, sweep each aisle on

8   both sides?

9       A    Because both sides could have dust under

10  them.

11      Q    Would this sweep guideline also cover

12  spills that might be on the floor?

13      A    Yes, but if there was a spill, we wouldn't

14  use a dust mop to clean it up.

15      Q    If there -- I'm sorry, if you came up to a

16  spill --

17      A    -- yes --

18      Q    -- while you were dust mopping, could you

19  use that dust mop to wipe up the spill?

20      A    If it was small enough, yes.

21      Q    Okay.  And the reason why you sweep each

22  aisle on both sides is because the width of the

23  dust mop is not wide enough to cover the whole width

24  of the aisle.  That's why you have to go down one

25  side and come back the other; is that true?

22

1    A    Yes.

2    Q    Make sense?

3    A    Yes.

4    Q    I mean, I don't know if you were -- were

5    you told in training why the policy was sweep each

6    aisle on both sides?

7    A    I mean, yes, but they didn't say because of

8    the width.  I mean, that's just kind of common sense.

9    Q    Common sense?

10   A    That it doesn't reach both lips.

11   Q    Right.  In Exhibit 17, the photograph, does

12   it show Garrett Peterson dust mopping down the center

13   of the aisle 13?

14   A    No.

15   Q    It doesn't?

16   A    No.

17   Q    Which side are you dust mopping in that

18   photo?

19   A    I'm in the middle of the aisle.

20   Q    You're in the middle of aisle?

21   A    Yes.

22   Q    I thought that's what I said.  Maybe not.

23   I'll rephrase the question.  Does Exhibit 17 show

24   Garrett Peterson dust mopping the middle of aisle 13

25   on July 12 at approximately 7:50 a.m.?

23

1    A    Yes.

2    Q    Now, this fall -- strike that.

3              (Plaintiff's Exhibit No. 18 was

4         marked.)

5    Q    (By Mr. Fryer)  Strike that.  Let me ask

6  you this:  Let me show you what I've marked as

7  No. 18.  Do you recognize that photograph, what's in

8  a photograph?

9    A    Yes.

10   Q    Does that also Garrett Peterson at

11  7:50 a.m. and 25 seconds?

12   A    Yes.

13   Q    And it shows you in aisle 13?

14   A    Yes.

15   Q    And it shows you farther forward towards

16  the front of the store than Exhibit 17?

17   A    Closer to the top --

18   Q    -- tell me what the time is on 17.

19   A    7:50:31.

20   Q    7:50?

21   A    31.

22   Q    31?

23   A    Yes.

24   Q    And this time is what?

25   A    7:50:25.

24

```
 1        Q    Okay.  So this picture is six seconds --

 2        A    -- before --

 3        Q    -- before No. 17?

 4        A    Yes.

 5        Q    And it also shows you in the middle of the

 6   aisle?

 7        A    No.  More or less, yes.

 8        Q    More or less, yes, okay.

 9             Okay.  Have you been told what time

10   Ms. Houston slipped and fell in aisle 13?

11        A    Yes.

12        Q    What time were you told she slipped and

13   fell?

14        A    Approximately 7:48-ish.  I'm not sure of

15   the exact time.  I've been told it.  I haven't

16   memorized it.

17        Q    Okay.  Let me what you what I'm going to

18   mark as No. 19.

19             (Defendant's Exhibit No. 19 was

20             marked.)

21        Q    (By Mr. Fryer)  And ask you if you

22   recognize what's depicted in that photograph?

23        A    Yes.

24        Q    Does that show aisle 13?

25        A    Yes.
```

1    Q    And what is the time on that picture?

2    A    7:54:15.

3    Q    So it's 7:54:15.  And the prior photograph

4    is 7:30?

5    A    Yes.

6    Q    So about four minutes later, correct?

7    A    Yes.

8    Q    So am I correct in stating that you dust

9    mopped down the middle of the aisle at approximately

10   7:50 a.m., and then four minutes later Ms. Houston

11   apparently slipped and fell in the aisle?

12   A    Yes.

13   Q    Do you know whether she slipped and fell in

14   the aisle at a location where you had dust mopped?

15   A    Yes.

16   Q    Okay.  And what do you know about that?

17   A    No.

18   Q    Okay, she did not?

19   A    No.

20   Q    So you dust mopping down the middle of the

21   aisle did not cover the area of her slip and fall,

22   correct?

23   A    No.

24   Q    I'm correct?

25   A    Yes, you are correct.

30

1    with the straw broom and then the dust mop.

2        Q    On the morning of July 24 when you got to

3    work, what was the first thing that you would have

4    done that morning; dust mop?

5        A    No.  I did not --

6        Q    -- what would you have done?

7        A    There's no required dust moppers.  That's

8    not a job title.  It would be -- that would be

9    whoever the manager tells to do it.  I would show up

10   and clock in and just go start bagging groceries.

11       Q    Okay.  So that's what you normally did --

12       A    -- right --

13       Q    -- at that period of time, June 30 to

14   July 24?

15       A    Yes.

16       Q    You would show up and you would start

17   bagging groceries?

18       A    Yes.

19       Q    And a manager might come and say, I want

20   you to dust mop the floors?

21       A    Yes.

22       Q    And you believe on July 24 that's what

23   happened?

24       A    Yes.

25       Q    That Ms. Roy came and asked you to dust mop

31

1   the floors?

2       A    Yes.

3       Q    Would that have been all of the floors in

4   the grocery store?

5       A    Yes.  It would -- yeah, she would want me

6   to walk around the whole store.

7       Q    Did you have a personal preference about

8   how you did that?  First let me ask you, was there a

9   procedure that you were told how to do it?

10      A    No.

11      Q    In other words, start at aisle 1 and go all

12  the way to 13?

13      A    No, there's no given procedure.  Everyone

14  kind of does it their own way.

15      Q    Did you have a personal preference about

16  how you would dust mop the floors?

17      A    As far as the order or --

18      Q    -- right.

19      A    No, I would -- I would just -- normally I

20  started, I think, towards the produce area and worked

21  my way down to 13 and back, but on the -- I've done

22  it a number of ways.

23      Q    So would you, on occasions, go down aisle 4

24  and then go across to aisle 7 and come down 7 and

25  then go along the rear aisle and go up 5?  I mean,

35

1        Q       Yes.

2        A       There's no time stamp on this photograph.

3        Q       Oh, there no time -- no time stamp?

4        A       No time.

5        Q       Okay.  Would it be correct to assume that

6    this occurred before Ms. Houston left the store that

7    morning?

8        A       Yes.

9        Q       So it would have occurred between the time

10   that she slipped and fell and the time that she left

11   the store?

12       A       Can you say that again?

13       Q       It occurred between the time that she

14   slipped and fell and when she left the store?

15       A       Yes.

16                       (Video off.)

17                       (Brief recess.)

18                       (Video on.)

19       Q       (By Mr. Fryer)  Garrett, when did you stop

20   working at Publix approximately 30 hours a week?

21       A       Mid August of 2013.

22       Q       And that was due to?

23       A       I moved.  I relocated.

24       Q       And where did you relocate to?

25       A       Sharpsburg, Georgia.

36

1    Q    Is that where you live now?

2    A    Yes.

3    Q    And what is your home address?

4    A    4 Shelby Bluff, Sharpsburg, Georgia, 30277.

5    Q    And is 4 Shelby Bluff an apartment?

6    A    No.

7    Q    It's a house?

8    A    Yes.

9    Q    And who lives with you at Shelby Bluff?

10   A    I live with five other people:  Luke Ayers,

11   Tyler Dunn, Joe Harrell, and Bryant Jones.

12   Q    And you've live there since when?

13   A    Mid August of 2013.

14   Q    And do you have any plans on moving anytime

15   soon?

16   A    No.

17   Q    So since mid August of '13 you've lived in

18   Sharpsburg and you're now attending Georgia State?

19   A    I attended Georgia State in 2012 was my

20   first year.  And I took a semester off this semester

21   to work.

22   Q    So you work at Chick-fil-A?

23   A    Yes.

24   Q    Full time?

25   A    Yes.



PLAINTIFF'S
EXHIBIT
17
12/4/13 5 EK





## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have this day served all counsel of record in the

foregoing matter with **Plaintiff's Motion for Leave to Add Party Defendants** and

Brief in Support with the Clerk of the Court using CM/ECF system which

automatically sends a service copy via email notification upon the following

counsel:

> Gene Major, Esq.
> Richard Brown, Esq.
> Fain, Major & Brennan, P.C.
> Suite 500
> 100 Glenridge Point Parkway
> Atlanta, Georgia 30342

> This 9th day of January, 2014.

> /s/ Keith E. Fryer
> **Attorney for Plaintiff**
> **Georgia Bar No. 279037**

FRYER, SHUSTER & LESTER, P.C.
1050 Crown Pointe Parkway - Suite 410
Atlanta, Georgia  30338
770-668-9300

THIS IS TO CERTIFY that, pursuant to LR 5.1B, NDGa., the above document was
prepared in Times New Roman, 14 pt.